IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERRANCE SIMS, | ) | CASE NO. 1:15CV1128 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Terrance Sims ("Sims") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

On September 27, 2011, Sims protectively filed an application for DIB and SSI, alleging a disability onset date of January 2, 2009. Tr. 16. He alleged disability based on the following: "back problems-deteriorating disc-numb legs" and psychiatric problems. Tr. 276. After denials by the state agency initially (Tr. 131, 135) and on reconsideration (Tr. 141, 145), Sims requested an administrative hearing. Tr. 150. A hearing was held before Administrative Law Judge ("ALJ") Penny Loucas on September 18, 2013 (Tr. 44-65) and a supplemental hearing was held

on January 15, 2014 (Tr. 1111-1145).[1]  During the supplemental hearing, Sims amended his alleged onset date to March 31, 2012.  Tr. 16, 265, 1120.  In her February 13, 2014, decision (Tr. 16-55), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Sims can perform, i.e., he is not disabled.  Tr. 33.  Sims requested review of the ALJ's decision by the Appeals Council (Tr. 10) and, on April 21, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Sims was born in 1960 and was 51 years old on the date his application was filed.  Tr. 32.  He previously performed work as a hospital cleaner, industrial cleaner, tire repairer, dye forge helper, material handler and spot welder.  Tr. 61-62.  He last worked in 2008.  Tr. 57, 267.

### B. Relevant Medical Evidence[2]

On September 16, 2011, Sims presented to the emergency department complaining of chronic headaches that had lasted two weeks and that extended along the nape of his neck.  Tr. 394.  A CT scan of his cervical spine revealed multilevel degenerative spinal canal and neural foramina narrowing, most severe at C-6 and C-7.  Tr. 396.

At a follow-up visit on September 20, 2011, Sims complained of having intermittent headaches for the last two months and back pain radiating down his left leg to his knee.  Tr. 432.

On October 25, 2011, x-rays of Sims's cervical spine showed degenerative spurring off the anterior end plates of the C2-C7 vertebral bodies, degenerative disc disease at the C3-4, C4-5

---

[1] The transcript from the second hearing was filed on the docket as a Supplemental Transcript of Proceedings (Doc. 11).

[2] Sims only challenges the ALJ's decision with respect to his physical impairments.  *See* Doc. 15.  Accordingly, only the medical evidence relating to Sims's physical impairments is summarized herein.

2

and C5-6 levels and mild straightening of cervical lordosis which may be secondary to positioning of muscle spasm. Tr. 438.

On October 27, 2011, Sims saw Virginia Edwards, CNP, complaining of headaches "for years" and having them every day for two to three months. Tr. 483. He reported neck pain with some tingling that radiated down to his arms and hands and back pain that radiated down to his left leg. Tr. 483. Upon examination, Edwards noted that Sims's gait was "slow and antalgic: much worse when I had him walk than when he walked back to room." Tr. 485. Her impression was that Sims showed evidence of radiculopathies at C6 on the left and C7 on the right. Tr. 485. She referred him to physical therapy and prescribed Gabapentin and a follow-up appointment in two months. Tr. 485.

On November 30, 2011, Sims was discharged from physical therapy because of his lack of improvement and his failure to meet most of his short term goals. Tr. 518-519. His overall range of motion had worsened from his initial evaluation and he continued to report intense headaches and severe neck and arm pain. Tr. 518.

An x-ray taken of Sims's left knee on December 12, 2011, revealed normal joint spaces, no evidence of effusion, and a small patellar spur. Tr. 547.

On March 31, 2012, Sims presented to the emergency department complaining of lower back pain on his right side radiating down to his right leg. Tr. 587. He reported that the pain began a few days earlier after he did some push-ups. Tr. 588. He denied a history of back pain and also reported pain in his neck. Tr. 587. He was diagnosed with a back strain. Tr. 587.

On May 31, 2012, an x-ray of Sims's lumbar spine indicated some anterior spurring at L2, L3 and L4, but otherwise showed normal vertebral body height and alignment and well-maintained disc spacing. Tr. 623. An x-ray study of his right knee was unremarkable. Tr. 622.

An MRI of Sims's cervical spine taken on June 11, 2012, showed a normal craniocervical junction and no cord abnormalities.  Tr. 624.  He had left sided uncovertebral joint spurring and moderate left foraminal narrowing at C2-C3, end-plate and uncovertebral joint spurring with severe left foraminal narrowing at C3-C4, end-plate and uncovertebral joint spurring with severe bilateral foraminal narrowing at C4-C5; end-plate and uncovertebral joint spurring and marked bilateral foraminal narrowing at C5-C6 and end-plate and uncovertebral joint spurring with moderate bilateral foraminal narrowing at C6-C7.  Tr. 624.  The impression was cervical spondylosis that "causes only minimal cord compression at C3-4 and C4-5" and significant foraminal narrowing.  Tr. 625.

On November 8, 2012, Sims saw Michael Harris, M.D., at Metro Health Physical Medicine and Rehabilitation complaining of nerve pain on the right side of his neck.  Tr. 726.  Sims was referred to Dr. Harris after Sims fell on his left elbow three days before which aggravated his shoulder, neck and right arm pain.  Tr. 726.  Upon neurological examination, Dr. Harris found Sims to be normal other than his tandem gait, which was slow but without any loss of balance.  Tr. 730.  Sims's cervical range of motion was "slightly decreased but within functional limits in all planes."  Tr. 730.  The treatment note states, "[Sims] has severe pain that is a significant barrier to employment."  Tr. 730.

At a follow-up visit on March 8, 2013, Sims described "moderate relief" from the physical therapy he had undergone but noted that he did not continue with the physical therapist's home exercise program.  Tr. 857.  He continued to complain of neck and right arm pain and numbness.  Tr. 857.

On May 10, 2013, Sims saw Dr. Harris for a follow-up appointment.  Tr. 900-903.  Sims reported "really struggling with persistent neck pain with a radicular pain radiating into the right

4

arm, pain scale 8-9/10." Tr. 900. The treatment note reads that Sims reported that his neck pain was "intolerable and he really limits his functional capabilities." Tr. 900. Dr. Harris recommended considering a stronger opioid and concluded, "[Sims] is incapable of gainful employment in any capacity. He is totally and permanently disabled." Tr. 903.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinion

On May 8, 2013, Dr. Harris completed a Medical Source Statement on behalf of Sims. Tr. 897-898. Dr. Harris opined that Sims was restricted to frequently lifting and carrying no more than five pounds, standing and walking up to 30 minutes at a time for three hours total, and sitting for 30 minutes at a time for a total of four hours. Tr. 897. Dr. Harris indicated that Sims experiences severe pain that interferes with his concentration, causes him to be off task and causes absenteeism, and requires him to take an extra one-hour break beyond the customary workplace breaks throughout a workday. Tr. 898.

#### 2. Consultative Examiner

On October 24, 2013, Sims saw consultative examiner Dariush Saghafi, M.D. Tr. 976-978. Sims's chief complaint was upper back pain. Tr. 976. Upon examination, Dr. Saghafi found Sims to have full strength in all extremities. Tr. 977-978. His conclusion was that Sims suffered from cervicalgia without any evidence of radiculopathy or neuropathy, he likely suffers from degenerative disk disease of his cervical spine that is moderate in nature, and that he was very tired and lethargic secondary to his medications. Tr. 978. He opined that Sims is neurologically intact, could lift, push and pull sufficiently to perform activities of daily living, can bend, walk and stand despite an antalgic gait for which he uses a cane for stability, and that

he was likely able to perform light work that would include primarily sitting with some walking or standing.  Tr. 978.

### 3. State Agency Reviewers

On January 12, 2012, state agency physician Maria Congbalay, M.D., reviewed Sims's record.  Tr. 92, 94-96.  Regarding Sims's physical residual functional capacity ("RFC"), Dr. Congbalay opined that Sims can perform light work with additional postural limitations and limited pushing, pulling and overhead reaching.  Tr. 95-96.

On October 11, 2012, state agency physician Esberdado Villanueva, M.D., reviewed Sims's record and affirmed Dr. Congbalay's findings in addition to opining that Sims should avoid moderate exposure to hazards.  Tr. 110-112.

### D. Testimonial Evidence

#### 1. Sims's Testimony

Sims was represented by counsel and testified at both administrative hearings.  Tr. 48-64, 1113-1137.  He described how he first experienced pain in his neck and upper back after he separated from his last employment in 2008.  Tr. 1122-1123.  He went to a doctor who examined him, told him he had "a very bad disc," and that he needed surgery "immediately."  Tr. 58.  His insurance would not cover it so he had to "take the lesser treatments."  Tr. 58.  His right arm sometimes gets stuck, his neck constantly hurts, and he has fallen because of his knees.  Tr. 58.  First it was the right knee but then "it went from my right knee to my left knee now."  Tr. 58.  He had therapy on his left knee but the therapists could not help him.  Tr. 58.

When asked what his pain level was, generally, on a scale of one to ten, "ten being you report to the emergency room pain," Sims stated that his pain level was ten.  Tr. 1123.  His attorney pointed out that Sims had not been in the emergency room all the time and Sims

responded, "I know, I know. But I—if I had a choice to keep going back to the emergency room, I would go" but his doctors told him they were going to help him find a solution. Tr. 1123. He stated that the pain in his arm is an eight out of ten. Tr. 1124. He also had "complete stiffness" in the movement of his neck. Tr. 1124-1125. He has a "crick" in his neck "all the time" and has to keep it wrapped up warm. Tr. 1125. He also takes "plenty of Neurontins" and other medications. Tr. 1125. With respect to his hand, he "drop[s] stuff all the time and then this nerve down my right arm it's like [] a nerve pain constantly shoots through there periodically so basically if I had my choice, I would [] like to either keep my hand in my pocket or wear a sling ... to try to eliminate some of the pain I've been going through." Tr. 1125.

Sims testified that he has been using a cane for a little over a year. Tr. 1126. He holds it in his left hand. Tr. 1126. He stated that it was prescribed to him and explained that, when he was going to physical therapy, the therapists saw that therapy was not working and offered him a walker, which he did not want, and then a cane, which he said he would try. Tr. 1130. He started using the cane because he said he fell. Tr. 1131. His physical therapist wanted him to use the cane in his right hand "to try to keep the—not to baby the left knee," and he tried it but it "didn't work out, you know, and I failed." Tr. 1131. Now he just keeps it on his left side "since my left knee is weak." Tr. 1131. Since he has been complaining about his left knee, "they're going to do some further treatment." Tr. 1132.

Sims stated that he had injections twice in his knee and twice in the middle of his back. Tr. 1132. After the first back injection he felt a little relief, but then the doctor told him he needed to try to do some exercise "or whatever" and that "just opened the doors back so I went and got another injection." Tr. 1133. The second injection was different and made things worse.

7

Tr. 1133.  He thinks he may have moved when he got the injection and he does not want any more injections.  Tr. 1133.

Because of his conditions, Sims stated that he can only sit for fifteen minutes and then gets uncomfortable.  Tr. 1133.  He needs to stand "to get the blood back in it."  Tr. 1133.  When sitting, he feels discomfort "between my knee joints—right between my knee joints and it's like it's just weak."  Tr. 1133.  He can stand for fifteen or twenty minutes before feeling uncomfortable.  Tr. 1134.  He can walk a block and it is hard to go up and down stairs.  Tr. 1134.  He is able to drive but does not do so because he does not have a car.  Tr. 1134.

Sims does not perform chores around the house; his wife does them or his grandchildren come by and do some work for him.  Tr. 1135.

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE") Ted Macy testified at the first hearing.  Tr. 60-62.  The ALJ discussed with the VE Sims's past work and asked the VE to characterize that work.  Tr. 61.  The VE summarized Sims's jobs as follows: hospital cleaner, medium unskilled work; industrial cleaner, medium unskilled work; tire repairer, heavy semi-skilled work; dye forge helper, heavy unskilled work; material handler, heavy semi-skilled work; and spot welder, medium unskilled work.  Tr. 61-63.

VE Bret Sulkin testified at the second hearing.  Tr. 1137-1143.  The ALJ discussed with the VE Sims's past relevant work.  Tr. 1137-1138.  The ALJ asked the VE to determine whether a hypothetical individual of Sims's age, education and work experience could perform the work he performed in the past if the individual had the following characteristics: can perform light work, can occasionally push and pull bilaterally; can occasionally reach overhead bilaterally; can never climb ladders, ropes or scaffolds; can occasionally stoop, crouch and crawl; can frequently

kneel; must avoid jobs with exposure to hazards one third of the day or less; and can interact with coworkers and supervisors occasionally by speaking, signaling, and taking instructions. Tr. 1139.  The VE answered that such an individual could not perform Sims's past relevant work. Tr. 1139.  The ALJ asked if such an individual could perform any work and the VE answered that such an individual can perform work as a small products assembler (350 regional jobs; 1,500 Ohio jobs; 55,000 national jobs), housekeeper (1,000 regional jobs; 4,400 Ohio jobs; 134,000 national jobs), and mail sorter (500 regional jobs; 2,400 Ohio jobs; 63,000 national jobs).  Tr. 1140.

Next, the ALJ asked the VE whether the hypothetical individual could perform Sims's past work or the jobs identified by the VE above if the individual had the following, additional characteristics: can occasionally use foot pedals bilaterally and can occasionally, rather than frequently, kneel. Tr. 1140-1141.  The VE answered that such an individual could not perform Sims's past work but could perform the same jobs listed above. Tr. 1141.  The ALJ then confirmed with Sims's attorney that these hypothetical individuals would be considered disabled if they were restricted to sedentary work because they would be over 50 years old.  Tr. 1141. Lastly, the ALJ asked the VE what the greatest amount of time a worker could be off-task without it affecting her ability to maintain work and the VE answered that, in his experience, a worker could be off-task no more than 10% of the time.  Tr. 1141.

Next, Sims's attorney asked the VE whether the hypothetical individuals previously described could still perform light work if the individuals were limited to standing and walking three hours out of an eight-hour day and required a cane when standing and walking.  Tr. 1142. The VE replied that such individuals could not perform light work. Tr. 1142.  Sims's attorney asked if the individuals could perform light work if the cane requirement were removed and the

VE answered that the individuals could perform some work as a small products assembler and bench work jobs. Tr. 1143.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her February 13, 2014, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Act through December 31, 2013. Tr. 19.

2. The claimant has not engaged in substantial gainful activity since March 31, 2012, the amended alleged onset date. Tr. 19.

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, patellofemoral osteoarthritis of the left knee, and a mood disorder with antisocial and paranoid personality traits and reported psychotic features. Tr. 19.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 19.

5. The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b) and §416.967(b) except he can kneel no more than frequently, he can push, pull, stoop, crouch, crawl, or reach overhead no more than occasionally, he can never climb ladders, ropes, or scaffolds, he must avoid situations that would expose him to hazards for one-third of the day or less, he cannot perform work that requires him to interact with the public, and he can interact with coworkers and

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

        supervisors up to occasionally for speaking, signaling, or taking instructions.  Tr. 23.

6.     The claimant is unable to perform any past relevant work.  Tr. 31.

7.     The claimant was born on February 8, 1960 and was 52 years old, considered a "person approaching advanced age," on March 31, 2012, the date he alleges his disability began.  Tr. 32.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 33.

9.     Transferability of job skills is not material to the determination of disability because the Medical-Vocational Guidelines support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 33.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 33.

11.     The claimant has not been under a disability, as defined in the Act, from March 31, 2012, through the date of this decision.  Tr. 34.

## V. Parties' Arguments

Sims objects to the ALJ's decision on three grounds.  He argues that the ALJ failed to follow the treating physician rule or give good reasons when assigning "little weight" to the opinion of Sims's treating physician, Dr. Harris; that she failed to properly evaluate the opinion of consultative examiner Dr. Saghafi; and that she failed to "accept" Sims's need for a cane.  Doc. 15, pp. 7-15.  In response, the Commissioner submits that Dr. Harris is not a treating physician; that, regardless, the ALJ followed the proper procedure when assigning weight to his opinion and Dr. Saghafi's opinion; and that the ALJ explained why she did not credit Sims's use of a cane.  Doc. 18, pp. 9-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not err is assessing Dr. Harris's opinion

#### 1.  Dr. Harris is not a treating physician

Sims argues that the ALJ erred because she did not following the treating physician rule with respect to Dr. Harris's opinion. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502. The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's

13

medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

The plaintiff has the burden of showing that a doctor is a treating physician.  *See id.* at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four).  Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).  A physician qualifies as a treating source if the claimant sees him "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."  *Smith*, 482 F.3d at 876.

Sims characterizes Dr. Harris as his "longstanding treating physician."  Doc. 15, p. 8.  Dr. Harris only examined Sims twice—in November 2012 and again in March 2013—before rendering his functional assessment.  Sims does not assert that two visits in four months is consistent with accepted medical practice for the type of treatment and evaluation required for Sims's condition.  *See Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485, 491 (6th Cir. 2005) (physician not a treating source because the claimant only saw her twice for back pain and sought treatment for back pain elsewhere on other occasions); *Yamin v. Comm'r of Soc. Sec.*, 67 Fed. App'x 883, 884 (6th Cir. 2003) (two visits to a physician for leg pain did not provide

14

physician with a "long term overview" of the claimant's condition).  Any relationship Sims had with Dr. Harris after Dr. Harris rendered his opinion does not create a treatment relationship prior to Dr. Harris's opinion.  See *Kornecky*, 167 F. App'x at 506 n.10 (visits to a physician after the physician renders her opinion do not retroactively create an ongoing treatment relationship).  Thus, Sims has not met his burden of showing that Dr. Harris was his treating physician whose opinion is entitled to presumptive weight.

### 2. Even if Dr. Harris is deemed a treating physician, the ALJ followed the treating physician rule and gave good reasons for the weight she assigned to Dr. Harris's opinion

Even if Dr. Harris is considered to have been Sims's treating physician, the ALJ did not run afoul of the treating physician rule and gave good reasons for the weight she assigned to Dr. Harris's opinion.  As set forth above, if a physician is a treating source the ALJ must give the physician's opinion controlling weight if she finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson*, 378 F.3d at 544.  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Id*.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  See 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ gave Dr. Harris's opinion "little weight."  Tr. 29.  She explained that Dr. Harris's opinion was not supported by objective medical evidence, explaining that no

neurological deficits were found by numerous other specialists. Tr. 29. She stated that the opinion was not supported by Dr. Harris's own treatment notes, which were "void of objective evidence prior to the date on which he offered his opinions" and insufficient to explain the severe limitations assessed. Tr. 29. His opinion was inconsistent with other evidence in the record such as findings by other physicians, including the consultative examiner, Dr. Saghafi. Tr. 29. Dr. Harris's opinion was inconsistent with objective diagnostic evidence (a normal electromyogram and nerve conduction velocity study) and included a conclusory statement on a legal issue reserved for the Commissioner (Sims is unable to perform "gainful employment in any capacity"). Tr. 29. Thus, the ALJ complied with the treating physician rule by considering medically acceptable clinical and laboratory diagnostic techniques and the consistency of the opinion with other substantial evidence in the record when assessing Dr. Harris's opinion. *See Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2).

Sims also argues that the ALJ failed to provide good reasons for giving less than controlling weight to Dr. Harris's opinion. Doc. 15, p. 10. He argues that the ALJ "only considered two out of the five characteristics required" by 20 C.F.R. § 416.927(c)—the supportability and consistency of the opinion. Doc. 15, p. 11. He asserts that the ALJ failed to consider the length, frequency, nature and extent of the treatment relationship as well as the specialization of Dr. Harris. *Id*.

An ALJ is not required to discuss every factor in 20 C.F.R. § 416.927(c). *Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. March 16, 2011) ("Although the regulations instruct an ALJ to consider [the length, nature, and extent of the treatment relationship], they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor

16

analysis."). Even assuming the ALJ was required to consider all the factors, her failure to follow this procedural rule is harmless error when, as here, the Court can engage in meaningful review of the ALJ's decision. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (an ALJ's failure to give good reasons for assigning less weight to a treating source opinion is harmless error where the court can engage in meaningful review of the ALJ's decision).

Moreover, the ALJ referred to Dr. Harris as Sims's "physical medicine and rehabilitations specialist," thereby considering Dr. Harris's specialization. 20 C.F.R. § 416.927(c). And the ALJ explained that Dr. Harris's own treatment notes consistently contained references to objective findings only *after* the date upon which Dr. Harris rendered his opinion, indicating that the ALJ did consider the treatment relationship up to the relevant date, i.e., the date of Dr. Harris's opinion.

In sum, even if Dr. Harris could be considered a treating physician, the ALJ followed the treating physician rule and gave good reasons for assigning less than controlling weight to Dr. Harris's opinion; her decision, therefore, must be affirmed.[4]  *Francis*, 414 Fed. App'x at 804.

**B.  The ALJ did not err is assessing Dr. Saghafi's opinion**

Sims argues that the ALJ erred in "rejecting" the findings of the consultative examiner, Dr. Saghafi. Doc. 15, p. 12. He asserts that the ALJ "misstated and failed to give proper weight [sic] critical evidence that impacted Plaintiff's [RFC]" and accuses the ALJ of cherry-picking evidence that supports her decision. Doc. 15, pp. 12-13. Sims does not identify what the ALJ "misstated" or identify the "critical evidence" that she allegedly failed to give proper weight to.

---

[4] In the last sentence of this section of his brief, Sims asserts, "Furthermore, the ALJ's failure to provide a proper analysis of the evidence of record requires remand for a re-evaluation of this evidence and a new determination of Mr. Sims' residual function capacity." Doc. 15, p. 12. The Court does not consider this apparent argument by Sims because "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) (internal citations omitted).

The ALJ gave "significant" weight to Dr. Saghafi's opinion. Tr. 29. She described that Dr. Saghafi's examination produced normal physical findings and recited Dr. Saghafi's opinion that Sims could perform light work while primarily seated with some walking or standing. Tr. 29. With respect to this latter finding, however, the ALJ explained,

> While Dr. Saghafi's opinion is generally consistent with the record, there is little among his clinical findings to substantiate a limitation to mostly seated work other than the claimant's seemingly antalgic gait and use of a cane. As discussed above, the claimant's use of a cane is already suspect. Dr. Saghafi's notes reveal further indication that the claimant's cane is unnecessary. Dr. Saghafi noted that the claimant appeared to have a[n] antalgic gain "on the *right* without predisposition to falls" (Exhibit 20F, p. 8), which is not consistent with the claimant's abnormalities that might cause a gait disturbance. Because Dr. Saghafi did not review the claimant's knee x-rays prior to forming his opinion, he afforded great significance to the claimant's use of a cane. Dr. Saghafi's observation that the claimant is not predisposed to falls further reinforces the lack of a medical necessity for the cane. Given the claimant's uncharacteristic and inconsistent gait during Dr. Saghafi's exam, I find Dr. Saghafi's opinion that the claimant should perform primarily seated work unpersuasive.

Tr. 30. Previously, when discussing Sims's use of a cane, the ALJ stated,

> The claimant also walks with a cane, which he carries in his left hand despite complaining of left knee pain and instability. The claimant acquired a cane on his own initiative, first appearing using a cane at a physical therapy session in November 2011, where he was observed to be using it in a manner inconsistent with his physical complaints, and received training on how properly to use a cane. Nonetheless, the claimant continues to carry his cane in his left hand, where it provided little support for his allegedly painful and unstable left knee. The claimant's explanation for this—his limited ability to use his right arm—lacks meaningful objective diagnostic or clinical corroboration in the record, and is unpersuasive.

Tr. 28. The ALJ went on to explain that Dr. Syeda, a rheumatologist Sims saw one time, prescribed Sims's cane only after Sims requested it and that Dr. Syeda emphasized in her treatment note (in capital letters) that she found no joint line tenderness upon examination. Tr. 28. The ALJ also recounted that x-ray results showed a normal left knee joint with only a mild patellar spur and "copious evidence throughout the record that [Sims's] gait is normal despite the

18

cane." Tr. 28.  Thus, the ALJ, considering all the evidence, found that Sims's use of a cane suggested "an affectation."  Tr. 28.

Accordingly, the ALJ explained that she discredited the portion of Dr. Saghafi's opinion that was based on Sims's cane use because the ALJ found that Sims's cane use was not a medical necessity because it was only prescribed "per patient's request," it was not used by Sims in a manner consistent with cane use to support a left knee, there was insufficient objective clinical evidence in the record suggesting that Sims's left knee was so compromised that he required the use of a cane, Dr. Saghafi observed that Sims appeared to have an antalgic gait on his right, not left, side and, finally, Sims exaggerated the severity of his pain.[5]  Tr. 24-30.  The ALJ's decision with respect to Dr. Saghafi's opinion and Sims's cane use is well-explained and supported by substantial evidence and must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (a court must uphold the ALJ's decision if it is supported by substantial evidence).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

Dated: March 7, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[5] For example, the ALJ noted that at the supplemental hearing Sims stated he was currently experiencing pain that was 10/10 and "excruciating," yet "did not appear to be in such pain and did not express a need to seek immediate medical treatment for this pain." Tr. 27. The ALJ also explained that Sims completed a Neck Disability Index questionnaire wherein he indicated a pain level that the physical therapist noted was akin to being "either totally bed-bound or exaggerating symptoms." Tr. 25, 27 (citing Tr. 748 (physical therapy note also observing that Sims automatically used his right arm to reach down to retrieve his hat at the end of the session without apparent pain)).